UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


Troy A. Manteuffel,                                           Case No.  3:19-cv-2924

                         Plaintiff,

          v.                                                  MEMORANDUM OPINION
                                                              AND ORDER

HMS Host Tollroads, Inc.,

                         Defendant.


## I.  INTRODUCTION

Defendant HMS Host Tollroads, Inc., has filed a motion for summary judgment on all

claims asserted by Plaintiff Troy A. Manteuffel.  (Doc. No. 19).  Manteuffel filed a brief in

opposition, (Doc. No. 21), and HMS filed a brief in reply.  (Doc. No. 22).  For the reasons stated

below, I grant HMS's motion.

## II.     BACKGROUND

HMS operates convenience stores, gift shops, and restaurants at airports and travel plazas

throughout the United States, including at ten travel plazas located along the Ohio Turnpike.  (Doc.

No. 19-2 at 2-3).  Half of these travel plazas are located on the eastbound side of the Ohio

Turnpike, while the other half are located on the westbound side.  (*Id.*).  The travel plazas are

positioned in pairs, with one plaza on each side of the highway at the same mile marker.  (*Id.*).  HMS

employs a F&B Multi-Unit Operations Manager (each, a "Multi-Unit Manager"), to oversee each

pair of plazas.  (*Id.*).  Each Multi-Unit Manager is paid an annual salary and typically has a salaried

and an hourly assistant manager reporting to them, while each plaza has multiple hourly supervisors

who report to the assistant managers.  (Doc. No. 19-3 at 33).  The Multi-Unit Managers report to a

District Director of Operations, who oversees several different pairs of plazas.  (Doc. No. 19-2 at 3).

District Directors are responsible, directly or indirectly, for all workers at the plazas they oversee.

(Doc. No. 21-3 at 5).

In July 2018, Troy Manteuffel was hired by HMS as one of two District Directors.  (*Id.*).

Manteuffel was responsible for a total of six plazas in the eastern part of Ohio, between Vermilion

and the Pennsylvania border.  (Doc. No. 19-3 at 16-18).  The other District Director, Dan Sedlak,

was responsible for the remaining pairs of travel plazas.  (*Id.* at 52).  Manteuffel was paid an annual

salary of $75,000.  (*Id.* at 19).

Aside from a few-month period in the fall of 2018, there were three Multi-Unit Managers

who reported to Manteuffel: Jason Watchorn, Sharon Collins, and Darlene Sams.  (*Id.* at 32-33).

Manteuffel and Sedlak reported to Michael Migliori, HMS's Senior Director of Operations for the

Midwest Roadways.  (Doc. No. 21-3 at 3).

In December 2018, an employee at one of the plazas Manteuffel supervised called him a

"Nazi."  (Doc. No. 19-3 at 97-99).  Prior to this incident, the employee had been "struggling" with

her job duties for weeks, and Manteuffel had been coaching her on areas of needed improvement.

(*Id.*).  Manteuffel and the employee previously had discussed their common German heritage, and

Manteuffel believed the comment to be a derogatory reference to his national origin.  (*Id.*).

Manteuffel reported the incident to Migliori and to Stephanie Jones, the HMS Human Resources

Director.  (*Id.*).  Manteuffel alleges he filed a complaint about this incident with the Ohio Civil

Rights Commission on May 30, 2019.[1]  (Doc. No. 21 at 13).

Also in December 2018, Manteuffel and Watchorn raised concerns with Migliori about

expired food products being served at the travel plazas.  (Doc. No. 19-3 at 111-15; Doc. No. 21-3 at

18).  Manteuffel and Migliori had a discussion in Migliori's office about Starbucks whole bean coffee

that Manteuffel believed was expired.  (Doc. No. 21-3 at 18).  Migliori stated the date on the coffee

bags was a "best by" date, not an expiration date, and could be used safely.  (*Id.*); (*see also* Doc. No.

21-5 at 19).  Manteuffel asserts he did not feel comfortable serving the product, but that Migliori

told him to do so "or else [he would] find somebody who will."[2]  (Doc. No. 19-3 at 113).

On May 13, 2019, Manteuffel was placed on a 90-day performance improvement plan (the

"PIP") after some number of conversations with Migliori about Manteuffel's "communication and

leadership style."  (*Id.* at 132).  The PIP included "operational" and "communication/leadership"

objectives and called for Manteuffel to meet with Migliori every week to discuss his performance.

(*Id.* at 134).  Manteuffel was required to submit a written update regarding all performance objectives

at least one day prior to his weekly meetings with Migliori.  (*Id.*).  Further, Manteuffel was warned

that he would be subject to further disciplinary action, up to and including termination, if he did not

fulfill the objectives of the PIP.  (*Id.*).

In June 2019, Manteuffel again raised concerns about expired food products in the plazas he

supervised.  He sent two emails to Jones with pictures of the products which were past their

expiration dates.  (*Id.* at 156; Doc. No. 19-5 at 11-13).  Manteuffel had instructed the Multi-Unit

---

[1]  The outcomes of Manteuffel's internal complaint and his OCRC complaint are unclear from the materials the parties have filed on the docket.

[2]  The evidence in the record does not conclusively establish whether the Starbucks coffee was ever served.  (Doc. No. 21-3 at 18; Doc. No. 19-3 at 112-14).

Managers at those plazas to discard the expired products, and Jones confirmed via email that this was the proper course of action.  (*Id.* at 12-13).

Around this time, on June 13, 2019, Manteuffel fell while moving some boxes at one of the travel plazas.  (*Id.* at 23-29).  He applied some ice to his knee before continuing working.  While driving home, Manteuffel's pain level continued to increase, and he sought medical attention. Manteuffel was diagnosed with strains of his neck and lower back and sprains of his left wrist, knee, and ankle.  (*Id.* at 28-29).  The doctor instructed Manteuffel to take the following few days off work. (*Id.*).  Manteuffel subsequently filed a workers' compensation claim.  (*Id.* at 26).  He received physical therapy through this claim but was not paid workers' compensation wages.  (*Id.*).

Meanwhile, Manteuffel continued on the PIP.  The record in this case contains only a few documents from the three months the PIP was in effect, (*see* Doc. No. 19-3 at 142-48), but it suffices to say that the PIP did not create the desired results.  A performance action plan worksheet dated August 30, 2019, identifies eight bullet-pointed follow-up items from the PIP.  (*Id.* at 150-52). The worksheet indicates Manteuffel either had not met the goals mandated by the PIP or had failed to provide promised documentation of his compliance.  (*Id.*).  Manteuffel was terminated the same day for "fail[ing] to correct the deficiencies and maintain the expectations listed in [his] PIP and . . . fail[ing] to demonstrate continuous and sustained improved in [his] overall performance."  (*Id.* at 154).

Manteuffel filed suit in the Lucas County, Ohio Court of Common Pleas on November 14, 2019.  (Doc. No. 1-1 at 7).  He asserts the following claims: (1) wrongful termination in violation of public policy; (2) violation of the Fair Labor Standards Act ("FLSA"); (3) violation of the Ohio Minimum Fair Wage Standards Act; (4) failure to timely pay wages, in violation of Ohio Revised Code § 4113.15; (5) retaliation for filing a workers' compensation claim, in violation of Ohio Revised

Code § 4123.90; and, (6) retaliation, in violation of Ohio Revised Code § 4112.02.  (*Id.* at 10-12).

HMS timely removed the case to this Court.  (Doc. No. 1).

### III.    STANDARD

Summary judgment is appropriate if the movant demonstrates there is no genuine dispute of

material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).

All evidence must be viewed in the light most favorable to the nonmovant, *White v. Baxter Healthcare

Corp.*, 533 F.3d 381, 390 (6th Cir. 2008), and all reasonable inferences are drawn in the nonmovant's

favor.  *Rose v. State Farm Fire & Cas. Co.*, 766 F.3d 532, 535 (6th Cir. 2014).  A factual dispute is

genuine if a reasonable jury could resolve the dispute and return a verdict in the nonmovant's favor.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A disputed fact is material only if its

resolution might affect the outcome of the case under the governing substantive law.  *Rogers v.

O'Donnell*, 737 F.3d 1026, 1030 (6th Cir. 2013).

### IV.    ANALYSIS

### A.    COUNTS II, III, AND IV

In Counts II and III, Manteuffel alleges HMS violated the FLSA and Ohio's Minimum Fair

Wage Standards Act by failing to pay him overtime when he worked more than 40 hours per week.

(Doc. No. 1-1 at 10-11).  In Count IV, Manteuffel alleges HMS violated Ohio law when it failed to

timely pay him overtime wages.  (*Id.* at 11).  The parties agree that federal law applies to Manteuffel's

state overtime claim as well.  (Doc. No. 19-1 at 19; Doc. No. 21 at 3 n.11).  Therefore, I will analyze

these claims together.  *See, e.g., Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 501 (6th Cir.

2007) ("[W]e need consider only federal law on this issue, as the Ohio statute expressly incorporates

the standards and principles found in the FLSA.").

While employers generally are required to pay overtime compensation to employees who

work more than 40 hours in a week, the FLSA exempts certain classes of employees from this

requirement.  29 U.S.C. § 213.  HMS argues Manteuffel falls within the executive and administrative exemptions and, therefore, he was not entitled to overtime compensation.  I conclude Manteuffel qualifies for the executive exemption and grant HMS summary judgment in its favor on Manteuffel's overtime compensation claims.

The executive exemption applies to any employee:

(1) Compensated on a salary basis pursuant to § 541.600 at a rate of not less than $684 per week . . . exclusive of board, lodging or other facilities;

(2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;

(3) Who customarily and regularly directs the work of two or more other employees; and

(4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a).

The first element is not in dispute, as Manteuffel concedes he was paid more than $684 per week.  (*See* Doc. No. 19-3 at 19 (agreeing he was paid an annual salary of $75,000)).

Manteuffel claims HMS cannot establish the second element – that his primary job duties were related to management – because he "spent a portion of his day not performing any managerial tasks, but instead was performing menial tasks such as cooking, operating the register, restocking, and unloading delivery vehicles."  (Doc. No. 21 at 4).  Relatedly, Manteuffel argues HMS cannot establish the third element because, while he had three employees who reported directly to him, those "employees were generally autonomous," and Manteuffel did not have control over their pay or disciplinary measures.  (*Id.* at 5-6).  Manteuffel's arguments are not persuasive.

First, it is clear that the executive exemption is not limited to employees who perform only managerial duties.  The exemption itself uses the word "primary," and not "sole," when describing the applicable standard.  29 C.F.R. § 541.100(a)(2).  The Code of Federal Regulations defines the

6

employee's "primary duty" as "the principal, main, major[,] or most important duty that the
employee performs." 29 C.F.R. § 541.700(a). Moreover,

> "[c]oncurrent performance of exempt and nonexempt work does not disqualify an
> employee from the executive exemption if the requirements of § 541.100 are
> otherwise met. Whether an employee meets the requirements of § 541.100 when the
> employee performs concurrent duties is determined on a case-by-case basis and
> based on the factors set forth in § 541.700. Generally, exempt executives make the
> decision regarding when to perform nonexempt duties and remain responsible for
> the success or failure of business operations under their management while
> performing the nonexempt work. In contrast, the nonexempt employee generally is
> directed by a supervisor to perform the exempt work or performs the exempt work
> for defined time periods."

29 C.F.R. § 541.106(a).

Further, the Code of Federal Regulations defines management as including the following
activities:

> interviewing, selecting, and training of employees; setting and adjusting their rates of
> pay and hours of work; directing the work of employees; maintaining production or
> sales records for use in supervision or control; appraising employees' productivity
> and efficiency for the purpose of recommending promotions or other changes in
> status; handling employee complaints and grievances; disciplining employees;
> planning the work; determining the techniques to be used; apportioning the work
> among the employees; determining the type of materials, supplies, machinery,
> equipment or tools to be used or merchandise to be bought, stocked and sold;
> controlling the flow and distribution of materials or merchandise and supplies;
> providing for the safety and security of the employees or the property; planning and
> controlling the budget; and monitoring or implementing legal compliance measures.

29 C.F.R. § 541.102.

The record establishes that Manteuffel's primary duty was management. Manteuffel:
planned job fairs to recruit new employees at his travel plazas, (Doc. No. 19-7 at 3); participated in
interviews for job applicants, (*id.* at 2, 4, 23); hired new employees, (*id.* at 5, 30); fired employees, (*id.*
at 28); instructed his Multi-Unit Managers to develop plans for training employees for work at
specific food service outlets, (*id.* at 6); required Multi-Unit Managers to schedule a manager to be in
charge of each retail or restaurant outlet at each travel plaza and to select two other managers to
help run those outlets, (*id.* at 8); provided specific expectations for Multi-Unit Manager schedules,

including that all Multi-Unit Managers work opening, closing, and weekend shifts, (*id.* at 11, 15, 60); issued written warnings to employees alleged to have violated company policy and otherwise participated in the disciplinary process, (*id.* at 10, 14, 27, 33, 36, 39, 40); monitored plaza schedules to ensure employee hours and schedules were based upon projected sales figures, (*id.* at 16, 18, 21, 22, 58, 59); instructed employees as to the qualifications and standards which must be met in order to be considered for promotions, as well as addressed deficient work performance by employees and managers (*id.* at 18, 25, 30, 34, 35, 36, 37, 42, 44); provided input on employee pay, including for Multi-Unit Managers, (*id.* at 30, 32, 45, 46, 48); gave directives to Multi-Unit Managers as to the employee who should be responsible for performing certain work, including writing schedules for the travel plazas; (*id.* at 27, 31); and ensured his travel plazas were in compliance with Ohio law governing breaks and work hours for employees under the age of 18.  (Doc. No. 19-3 at 133, 142).

Manteuffel acknowledged it was his responsibility to make sure that he and "the people who reported to [him] had solutions in place to meet the targets" for sales and employee work hours. (Doc. No. 19-3 at 72).  He coached the Multi-Unit Managers "from a franchise standpoint, from a business operator standpoint, . . . [that] these are our areas of opportunity[,] and this is what needs to be addressed, especially food handlings." (*Id.* at 75).  He gave specific directions as to product storage and ordering.  (Doc. No. 19-7 at 32).  He created plans to ensure the outlets at his travel plazas were in compliance with the franchisor regulations so that the outlet was not in default under the terms of the franchise agreement.  (*See, e.g.,* Doc. No. 19-3 at 44-50).  In short, it was Manteuffel's "responsibility to ensure that the day-to-day operations were being taken care of" at his travel plazas.  (*Id.* at 30).

Manteuffel asserts his managerial duties were limited to sending and responding to emails, "guesstimat[ing]" he spent anywhere from 80 to 95% of his time doing nonexempt work.[3] (Doc. No. 19-3 at 87).  But the record evidence does not bear this out.  Manteuffel cites only to the deposition testimony of Joseph Walls in support of his contention that HMS cannot establish his primary duties were managerial.  (Doc. No. 21 at 4 n.17).

Walls was the assistant food and beverage operations manager at the Great Lakes Plaza. (Doc. No. 21-2 at 3).  Walls testified during his deposition that Manteuffel visited the Great Lakes Plaza "[m]aybe once or twice a week," and that he observed Manteuffel run the register, prepare food, restock, and cook at the Burger King and Kentucky Fried Chicken outlets at that plaza.  (*Id.* at 4-5).  Walls also testified he observed Manteuffel unloading trucks and restocking goods in some outlets within the plaza.  (*Id.* at 5).  But Walls was unable to provide any specific information with respect to how often Manteuffel performed these tasks, testifying only that he saw Manteuffel do so "more than once."  (*Id.*).

Moreover, Manteuffel's contemporaneous accounts of his workdays conflict with his later deposition testimony.  After he was placed on the PIP, Manteuffel was required to provide weekly summaries of his activities and how he was endeavoring to meet the operational and leadership objectives set forth in the PIP.  Manteuffel described how he:

- disciplined the Multi-Unit Manager responsible for the Tow Path Plaza after managers at that plaza failed to prevent violations of minor labor laws;

---

[3]  HMS argues the fact that Manteuffel performed any nonexempt work was "only . . . because he failed as an executive to provide for appropriate staffing." (Doc. No. 19-1 at 32).  The record does not support this assertion, as work schedules were set in advance based upon projected sales and could be impacted by unexpected busy periods or short-staffing due to employee illness.  Moreover, the Code of Federal Regulations plainly foresee that an exempt employee may need to perform nonexempt work, and that the exempt employee may do so without being disqualified from the executive exemption. 29 C.F.R. § 541.106(a).  The general principle stated in § 541.106(a) was true in this case, as Manteuffel remained "responsible for the success or failure of business operations under [his] management while performing the nonexempt work."  *Id.*

9

- monitored weekly and monthly cost reports, and instructed Multi-Unit Managers to work to reduce, and eventually eliminate, overtime hours at their plazas;
- conducted "thorough walk throughs with [the] multi[-unit] manager, plaza manager, and managers on dut[y]" to identify any issues and to ensure those issues were immediately corrected;
- conducted a weekly meeting with the Multi-Unit Managers;
- ensured the "managers [were] completing the assigned tasks as outline[d] in their job descriptions";
- "always coaching [the managers] in the moment" whenever he was working at a plaza;
- followed up "daily" with managers about hiring, applications, and employee reviews;
- led by example; and,
- worked with "all level of . . . managers on career goals" and "creating a path for them to take."

(Doc. No. 19-3 at 142-44).

As I stated above, the record evidence simply does not support Manteuffel's argument that "[l]ittle of what [he] did constitutes 'management.'" (Doc. No. 21 at 4). No reasonable jury could conclude that Manteuffel's primary duty was not management. *See, e.g., Holt v. City of Battle Creek*, 925 F.3d 905, 911 (6th Cir. 2019) (affirming plaintiffs' primary duties were managerial where they "were required to directly supervise lower-ranking . . . personnel, evaluate personnel, administer and enforce department policy, and coordinate the day-to-day operations of the department") (citation and internal quotation marks omitted).

Manteuffel's arguments regarding the third element – that he customarily and regularly directed the work of at least two employees – may be dismissed more quickly. He concedes he "was the direct report" for at least three employees, the Multi-Unit Managers at his travel plazas. (Doc. No. 21 at 5-6). His assertion that these managers "were generally autonomous," and, therefore, he did not actually supervise them or direct their work, has no support in the record. (*Cf.* Doc. No. 19-7 at 6, 8, 11, 15, 27, 31, and 60).

10

Lastly, Manteuffel argues that HMS cannot establish the fourth element – that he had authority to hire and fire, or his recommendations regarding hiring, firing, or promotion of other employees were given particular weight – because "his recommendations were given little to no weight and were generally ignored." (Doc. No. 21 at 6).  Manteuffel's argument focuses on the fall on 2018, shortly after he completed his post-hiring training.  Around this time, HMS restructured its management tree to create the Multi-Unit Manager position in place of the prior system, in which each plaza had its own manager who reported to the District Directors.

Manteuffel was part of a three-person committee who interviewed the plaza managers being considered for the Multi-Unit Manager positions. (Doc. No. 19-3 at 40-41).  Manteuffel contends none of his recommendations for the three positions were taken, and that the positions were "predetermined" by Mike Migliori and Stephanie Jones. (Doc. No. 19-3 at 40-41).  But Manteuffel's argument ignores the fact that one of his recommendations – Sharon Collins – was hired as a Multi-Unit Manager, merely for a different pair of plazas than Manteuffel had suggested. (Doc. No. 21-3 at 9-10).

"The notion that a few rejected recommendations could be decisive contradicts the plain language of the regulation, which sets the standard at 'particular weight,' not complete or presumptive deference." *Emmons v. City of Chesapeake*, 982 F.3d 245, 257 (4th Cir. 2020) (citing *Holt*, 925 F.3d at 912).  More precisely, "[a]n employee's suggestions and recommendations may still be deemed to have 'particular weight' even if a higher level manager's recommendation has more importance and even if the employee does not have authority to make the ultimate decision as to the employee's change in status." 29 C.F.R. § 541.105.

Further, the fourth element does not require that an executive employee "have had authority over all personnel decisions." *McGill v. Nashville Tenn. Ventures, Inc.*, No. 3:19-CV-00922, 2022 WL 1914294, at *5 (M.D. Tenn. June 3, 2022).  Manteuffel's recommendation as to the salary to be paid

11

to the Multi-Unit Managers was adopted, (Doc. No. 19-7 at 32), and he made hiring and firing decisions with respect to employees at the travel plazas under his supervision. (*Id.* at 5, 28, and 30).

Manteuffel also contends his recommendations were not given any weight because he wanted to terminate Darlene Sams but, despite his recommendation, Sams was not terminated and eventually retired over a year after Manteuffel was terminated. But the record indicates Sams was not terminated because there was not sufficient documentation of substandard work performance, as required by HMS policy, to support her termination at the time Manteuffel sought to fire her. (Doc. No. 21-3 at 12). The fact that Manteuffel's discretion as to disciplinary and termination decisions was cabined by company policies and procedures does not create a genuine dispute as to whether he had authority to hire and fire or whether his recommendations were given particular weight. *Cf. Thomas*, 506 F.3d at 507 ("Even though Thomas's discretion was somewhat circumscribed by her district manager's supervision and Speedway's standardized operating procedures, she *daily* exercised discretion over matters vital to the success of her station.") (emphasis in original) (citations omitted).

I conclude HMS has established any reasonable jury would conclude Manteuffel qualified for the executive exemption under the FLSA[4] and grant its summary judgment motion as to Manteuffel's overtime claims. I also grant summary judgment in HMS's favor on Count IV, Manteuffel's prompt pay claim pursuant to Ohio Revised Code § 4113.15, as Manteuffel concedes he is entitled to recover on this claim only if he was not paid overtime wages to which he was entitled. (*See* Doc. No. 21 at 13).

---

[4]  In light of this conclusion, I need not consider HMS's arguments regarding the administrative exemption. *See Holt*, 925 F.3d at 912-13.

**B. COUNTS I, V, AND VI**

In Count I, Manteuffel claims he was terminated in violation of public policy, because he was disciplined and terminated after he raised concerns about serving expired food products. (Doc. No. 1-1 at 10). In Count V, he asserts he was terminated because he filed a workers' compensation claim. (*Id.* at 12). And, in Count VI, he claims HMS retaliated against him because he filed a complaint with the Ohio Civil Rights Commission ("OCRC"), alleging national origin discrimination. (*Id.*). Each of these claims fail because Manteuffel cannot establish his complaints and claim were the cause of his discipline or termination.

Claims under Ohio law for wrongful termination in violation of public policy have four elements:

> (1) that a clear public policy existed and was manifested either in a state or federal constitution, statute or administrative regulation or in the common law ("the clarity element"), (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy ("the jeopardy element"), (3) that the plaintiff's dismissal was motivated by conduct related to the public policy ("the causation element"), and (4) that the employer lacked an overriding legitimate business justification for the dismissal ("the overriding-justification element").

*Miracle v. Ohio Dep't of Veterans Servs.*, 137 N.E.3d 1110, 1113 (Ohio 2019) (citing *Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995)).

Even if I assume Manteuffel could establish the first two elements, I conclude HMS is entitled to summary judgment on this claim because Manteuffel has not offered evidence of causation.

While Manteuffel concedes there is no direct evidence linking the May 2019 PIP or his August 2019 termination to his December 2018 complaints about expired food products, he contends "the timeline of events raises questions" about the disciplinary actions taken against him. (Doc. No. 21 at 14). But Ohio courts considering public policy claims similar to Manteuffel's have held "'temporal proximity does not support a claim of retaliation absent other compelling

13

evidence.'" *Whitaker v. First Energy Nuclear Operating Co.*, 2013-Ohio-3856, 2013 WL 4792860, at *8 (Ohio Ct. App. Sept. 6, 2013) (quoting *Coch v. Gem Indus.,* 2005-Ohio-3045, 2005 WL 1414454, at *7 (Ohio Ct. App. June 17, 2005)).  The passage of over four months between Manteuffel's initial complaints to Migliori and his placement on the PIP do not support an inference of causation, and he offers no other evidence connecting the two events.[5] *See Kirk v. Shaw Envtl., Inc.*, No. 1:09-cv-1405, 2010 WL 2162018, at *11 (N.D. Ohio May 25, 2010) (holding the passage of two months between plaintiff's complaint and his termination did not support an inference of causation).

I conclude Manteuffel fails to establish a reasonable jury could conclude the PIP or his termination were caused by his complaints about expired food and grant HMS's motion for summary judgment on that basis.  *See McDermott v. Cont'l Airlines, Inc.*, 339 F. App'x 552 (6th Cir. 2009) (holding plaintiff could not create a genuine dispute of material fact as to causation on plaintiff's wrongful termination claim based upon temporal proximity alone).

Manteuffel's workers' compensation and OCRC retaliation claims fail for the same reasons. For both claims, Manteuffel must show a causal connection between his protected action and his termination.  *See Young v. Stelter & Brinck, Ltd.*, 881 N.E.2d 874, 877-78 (Ohio Ct. App. 2007) (plaintiff alleging retaliatory discharge for filing workers' compensation claim must show "there was a causal connection between his filing of the workers' compensation claim and his termination"); *Jaber v. FirstMerit Corp.*, 81 N.E.3d 879, 890 (Ohio Ct. App. 2017) (plaintiff alleging retaliatory discharge for filing complaint about national origin discrimination must offer evidence "'sufficient to raise an inference that the protected activity was the likely motivation for the adverse action'")

---

[5]  While Manteuffel argues "his treatment under the PIP . . . shows animus against him," (Doc. No. 21 at 14), I previously noted the record contains little, if any, evidence of what occurred with respect to the PIP from June until late August 2019, just prior to Manteuffel's termination.  Manteuffel's assertion in his summary judgment briefing that HMS acted with animosity is not borne out by the evidence.

(quoting *Varner v. Goodyear Tire & Rubber Co.*, 2004-Ohio-4946, 2004 WL 2244491, at *3 (Ohio Ct. App. Sept. 22, 2004)).

Again, the passage of two or more months between the protected activity and Manteuffel's termination, standing alone, is insufficient to establish a causal connection between the two events, and Manteuffel has not identified any other evidence which might establish such a connection. Therefore, I conclude HMS is entitled to summary judgment on these claims as well.

## V.    CONCLUSION

For the reasons stated above, I conclude there is no dispute of genuine fact with regard to any of Manteuffel's claims and that HMS is entitled to judgment as a matter of law on Counts I-VI. HMS's motion for summary judgment is granted.  (Doc. No. 19).

So Ordered.


s/ Jeffrey J. Helmick
United States District Judge

15